IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DENIS QUINETTE,<br><br>Plaintiff,<br><br>v.<br><br>DILMUS REED, CHIEF LYNDA COKER, CHIEF DEPUTY MILTON BECK, COLONEL DONALD BARTLETT, COLONEL LEWIS ALDER, COLONEL JANICE PRINCE, COLONEL ROLAND CRAIG, and SHERIFF NEIL WARREN<br><br>Defendants. | Civil Action<br>File No. 1:17-cv-01819-TWT |

## FIRST AMENDED COMPLAINT

On May 28, 2015, Defendant Dilmus Reed, then a jailer at the Cobb County Detention Center ("CCDC"), violently shoved Plaintiff Denis Quinette into a jail cell, causing Plaintiff to fall and suffer a broken hip. Plaintiff had not done anything to justify this use of violence and Defendant Reed was fired for his actions.

This was not Defendant Reed's first disciplinary action. Defendant Reed had been the subject of twelve prior internal affairs investigations, and was found to have violated policy six times – twice for excessive force.

1

Despite the clear warning signs, it took Defendant Reed violently breaking an inmate's hip before his superiors finally deemed Defendant Reed too dangerous to supervise inmates.

This is an action for money damages brought pursuant to O.C.G.A. §§ 51-1-13 and 51-1-14, as well as 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution, against Defendant Reed for his unnecessary use of violence against Plaintiff. In addition, this is an action for supervisory liability against the Cobb County Sheriff and CCDC command staff who failed to adequately terminate, discipline, or train Defendant Reed after an extensive disciplinary history, including two verified incidents of unwarranted violence against inmates, and who created a custom, pattern, and practice that allowed jailers to ignore written policies and to receive no retribution or punishment for violating those policies.

### Parties, Jurisdiction, and Venue

1. Plaintiff is a natural person and citizen of the United States of America, residing in Cobb County, Georgia, and is of full age.

2. Defendant Dilmus Reed is an individual who was, at all times relevant to the allegations in this complaint, an employee of the Cobb County Sheriff's Office, employed at the CCDC, acting under color of law.

3.   Defendant Chief Lynda Coker is an individual who was, at all times relevant to the allegations in this complaint, an employee of the Cobb County Sheriff's Office, employed at the CCDC as a member of command staff, acting under color of law.

4.   Defendant Chief Deputy Milton Beck is an individual who was, at all times relevant to the allegations in this complaint, an employee of the Cobb County Sheriff's Office, employed at the CCDC as a member of command staff, acting under color of law.

5.   Defendant Colonel Donald Bartlett is an individual who was, at all times relevant to the allegations in this complaint, an employee of the Cobb County Sheriff's Office, employed at the CCDC as a member of command staff, acting under color of law.

6.   Defendant Colonel Lewis Alder is an individual who was, at all times relevant to the allegations in this complaint, an employee of the Cobb County Sheriff's Office, employed at the CCDC as a member of command staff, acting under color of law.

7.   Defendant Colonel Janice Prince is an individual who was, at all times relevant to the allegations in this complaint, an employee of the Cobb County Sheriff's Office, employed at the CCDC as a member of command staff, acting under color of law.

8.  Defendant Colonel Roland Craig is an individual who was, at all times relevant to the allegations in this complaint, an employee of the Cobb County Sheriff's Office, employed at the CCDC as a member of command staff, acting under color of law.

9.  Defendant Sheriff Neil Warren is an individual who was, at all times relevant to the allegations in this complaint, Sheriff of Cobb County, tasked with operating the CCDC and a member of the CCDC command staff, acting under color of law.

10. This action is brought pursuant to 42 U.S.C. §§1983 and 1988, as well as the Fourth and Fourteenth Amendments of the United States Constitution.  Jurisdiction is founded upon 28 U.S.C. §§1331, 1343, and the aforementioned constitutional and statutory provisions.

11. All the parties herein are subject to the personal jurisdiction of this Court.

12. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) and N.D.L.R. 3.1B(3) because the event giving rise to this claim occurred in Cobb County, Georgia, which is situated within the district and divisional boundaries of the Atlanta Division of the Northern District of Georgia,

4

## Facts

13.     On or about May 28, 2015, Plaintiff was in custody at the Cobb

County Detention Center.

14.     Plaintiff had recently been arrested and was going through the

intake and booking process when this incident occurred.

15.     According to CCDC records, Plaintiff was housed in Intake

Holding Cell #10.  Plaintiff was still in the intake are of the jail and

had not yet been transported into general population.

16.     At the time, the CCDC had begun but not completed the intake

and booking process.

17.     At approximately 7:04 a.m., Defendant Reed opened the door to

Intake Holding Cell #10 to escort another inmate[1] into the cell.

18.     This entire incident was captured on video.

19.     As Defendant Reed was allowing the other inmate in to the cell,

Plaintiff was standing in front of the cell door hoping to get a jailer's

attention.

---

[1] The term "inmate" here is used in its colloquial sense.  It should not be
taken as a representation regarding the status of a person in custody in
terms of whether the custody is governed by the Fourth or Fourteenth
Amendments.

20.     Plaintiff had been standing at the door to the cell for a few minutes hoping to flag down a jailer to make a phone call, and Plaintiff can be heard on the video saying, "excuse me," to Defendant Reed when Defendant Reed opened the cell door.

21.     While Plaintiff had been hoping to flag down a jailer, he nevertheless remained respectful and polite, never banging loudly on the cell door or window, never yelling, and never causing any sort of disturbance.

22.     Rather than addressing Plaintiff's concern or question, Defendant Reed started to close the door on Plaintiff.

23.     When Defendant Reed started to close the door, Plaintiff placed his hand on the window in the center of the door as it was closing.

24.     Plaintiff did not use any force or pressure in placing his hand on the window, he was not pushing on the window, and he was not preventing Defendant Reed from closing the door.

25.     In fact, the door can be heard making contact with the frame in the video recording of the incident, demonstrating that Defendant Reed was not prevented from closing the door.

26.     Or, more specifically, the latch can be heard making contact with the strike plate.

27.     At that point, since Plaintiff was not pushing on the window or applying any pressure to the window at all, and since Defendant Reed had the door closed so far that the latch was in contact with the strike plate, Defendant Reed was not impeded or prevented from closing the door in any way.

28.     Defendant Reed easily could have finished closing the door and walked away.

29.     At that point, Plaintiff was not resisting any officer.

30.     At that point, Plaintiff was not presenting a threat of any kind to anybody – jailer, inmate, or otherwise.

31.     At that point, Plaintiff was not causing a disturbance.

32.     At that point, Plaintiff was not pushing on the door to the cell or applying any force or pressure to the door of the cell, and no reasonable person could have believed that he was pushing on the cell door or trying to get out of the cell.

33.     At that point, Plaintiff's hand was on the glass window of the cell door and was therefore visible to Defendant Reed, who was standing on the other side of the door.

34.     Because Plaintiff's hand was on the glass window of the cell door, and because the door was closed almost all the way (the latch was

already in contact with the strike plate), no reasonable person could believe that Plaintiff's hand was in danger of being injured by the door

35.     Then, rather than pushing the door the final few millimeters required for the latch to engage and the door to be shut and secured, Defendant Reed opened the door all the way, took one large step forward, and with two hands forcefully thrust Plaintiff toward the back of the cell.

36.     Immediately before Defendant Reed thrust Plaintiff across the cell, Plaintiff had put his hands up in a submissive posture.

37.     Prior to thrusting Plaintiff across the cell, Defendant Reed gave Plaintiff no warning of any sort.  Defendant Reed did give Plaintiff any instruction, direction, command, order, or any other indication that Plaintiff was doing anything wrong.

38.     It is also notable that Defendant Reed was a more physically imposing person than Plaintiff.  Plaintiff was then 54 years old and was quite visibly not a particularly strong or physically dominant individual.  Defendant Reed, in contrast, presented a bullishly strong figure.

39.     Plaintiff was thrown to the floor and landed on his left hip.  In the video, Plaintiff can be heard screaming in pain.

40.     Ignoring Plaintiff's screams, Defendant Reed slammed the door and walked away.

41.     Doctors would later determine that Plaintiff had suffered an "acute left subcapital hip fracture" – a broken hip.

42.     Defendant Reed would acknowledge during the ensuing internal affairs investigation that he "stepped into" pushing Plaintiff.  In other words, Defendant Reed did not push Plaintiff while standing in one place; he stepped into Plaintiff's space and heaved Plaintiff forcefully across the cell.

43.     Defendant Reed would also later acknowledge that he should not have stepped into the shove, and that this level of force was not necessary.

44.     Over the next hour after the incident, Defendant Reed did nothing to mitigate the effects of Plaintiff's severe injury.

45.     Defendant Reed returned to the cell after a minute or so while Plaintiff was still lying on his side in pain.

46.     Defendant stood over Plaintiff, grabbed Plaintiff's arms, and tried to pull Plaintiff off the ground.  Plaintiff was unable to stand since his hip was broken.

47.     Defendant Reed can also be heard in the video loudly proclaiming to Plaintiff that he had pushed Plaintiff because "You tried to rush me!" When Plaintiff protested this account, Defendant Reed leaned over Plaintiff and yelled, "Yes you did!  Yes you did!"

48.     Defendant Reed thus attempted to cover up his illegal use of force by creating a false justification for the use of violence and by intimidating Plaintiff in an attempt to force him to agree with Defendant Reed's false account, all while Plaintiff was lying on the ground writhing in pain.

49.     Defendant Reed then left the cell, escorting another inmate, at which point another jailer, Sergeant Peipmeier, stood over Plaintiff demanding, "so what's your malfunction today?"

50.     Defendant Reed re-entered the cell about a minute later, walked over to where Plaintiff was still lying on the ground, and continued to argue with Plaintiff about whether he had pushed Plaintiff to the ground.

51.     Defendant Reed then, again, grabbed Plaintiff's arms to try to drag Plaintiff to his feet.  Plaintiff again began screaming in pain.

52.     Defendant Reed stopped trying to drag Plaintiff to his feet and Plaintiff rolled slowly onto his stomach while visibly in extreme pain. Plaintiff can be seen in the video writhing and screaming in pain.

53.     Defendant Reed then stood over Plaintiff for another few minutes arguing that Plaintiff had pushed the door to the holding cell.

54.     Plaintiff can be heard in the video screaming in pain and telling Defendant Reed that he can't get up.  Defendant Reed can be heard saying, "Yes you can.  Yes you can."

55.     Plaintiff can then be heard saying, "I can't bend my leg;" Defendant Reed can be heard scoffing, "Yeah, right."

56.     At no point did Defendant Reed attempt to get medical attention for Plaintiff.

57.     Ultimately, Sergeant Peipmeier left the cell to report the incident to medical, and a nurse arrived more than seven minutes after Plaintiff was thrown to the ground.

58.     Over the next hour, medical staff and jailers entered and exited the cell, trying to determine how to treat Plaintiff.  After about an hour, an ambulance crew finally arrived to take Plaintiff to the emergency room where he was diagnosed with a broken hip.

59.     Defendant Reed was investigated after the incident.

60.     When Defendant Reed was interviewed in conjunction with the internal affairs investigation, he acknowledged that he had used such an amount of force against Plaintiff because he was mad at Plaintiff.

61.     Defendant Reed further claimed that he used such force against Plaintiff out of a fear that Plaintiff's fingers would be caught in the door.

62.     Of course, Plaintiff's hand was on the window, not next to the latching mechanism, so Defendant Reed's claimed justification for his use of force is contradicted by the video.

63.     Moreover, Defendant Reed already had the door's latch in contact with the strike plate when he decided to re-open the door, so it would have been factually impossible for Plaintiff's fingers to get caught in the door.

64.     Defendant Reed ultimately acknowledged that he used more force than was necessary

65.     The internal affairs inspection concluded as follows:

> On May 28, 2015, you [Defendant Reed] failed to comply with the policies, procedures, rules, and regulations of the Cobb County Sheriff's Office when you utilized an unreasonable and unnecessary amount of force against Inmate Denis Quinette (SOID # 000210119).  Your failure to maintain proper decorum resulted in Inmate Quinette being pushed to

the ground resulting in physical injuries that
required medical attention and admittance to the
hospital for care.  Your behavior resulted in a conflict
of interest with this agency based on your infractions
of established policy and procedures.

66.     Defendants Warren, Craig, Prince, and Beck all signed onto and

agreed with the conclusion of the internal affairs investigation, that

Defendant Reed "utilized an unreasonable and unnecessary amount of

force" against Plaintiff.

67.     Defendant Reed was terminated for this attack.

## Defendant Reed's Previous Disciplinary Incidents

68.     Defendant Reed was the subject of twelve internal affairs

investigations during his tenure with the CCDC.  Six of those internal

affairs investigations were concluded as "founded" or "sustained,"

meaning that Defendant Reed was found to have violated department

policy six times before he was eventually terminated.

69.     Most importantly here, three of those internal affairs

investigations were for using excessive force against restrained

inmates, with the first complaint being deemed "unfounded" because

there was no evidence definitively supporting the inmate's account over

Defendant Reed's, but the second and third were deemed "founded"

because the incidents were captured on video.

13

70.     Despite this lengthy history of department violations, losing his temper with inmates, and repeated incidents of excessive force, Defendant Reed was never terminated, nor was he adequately disciplined, supervised counseled, or trained.  Instead, Defendant Reed was allowed to continue on in a position where he would be in control if inmates without direct supervision.

71.     In other words, the supervisors at the CCDC turned a blind eye to Defendant Reed's repeated transgressions, creating a pattern of unchecked use of excessive force against inmates and ensuring that Defendant Reed would ultimately cause a serious injury to an inmate.

## January 11, 2005 Excessive Force

72.     On January 11, 2005, an inmate who had a colostomy bag filed a grievance with the CCDC that Defendant Reed had used excessive force against him.

73.     The inmate complained that Defendant Reed had twisted the chains of the inmate's waist cuffs, which had the effect of rupturing the inmate's colostomy bag, causing extreme discomfort and some bleeding.

74.     The encounter was not captured on video and there were no eyewitnesses other than the inmate and Defendant Reed.

75.     The inmate reported in an inmate grievance that, during the incident, he told Defendant Reed that Defendant Reed was "bursting" the inmate's colostomy bag, and Defendant Reed told the inmate to "shut up" or "[his] colostomy bag wasn't all that would be busted," and rammed the inmate's head into a closed door.

76.     The inmate did not threaten Defendant Reed, use force, or take any other action that would have justified a use of force by Defendant Reed.

77.     Defendant Reed disputed the inmate's complaint, but Defendant Reed gave inconsistent versions of what occurred.

78.     First, Defendant Reed wrote in his report: "I took hold of the back of his waist chains and escorted him to R-Pod.  [The inmate] informed me that he had a colostomy bag, he did not say anything else to me after that.  He did not ask for medical attention nor did he appear to be in any type of distress."

79.     When interviewed during the internal affairs investigation, however, Defendant Reed claims that he never heard anything about a colostomy bag until he was informed later.  Defendant Reed claimed that he did smell a foul odor while escorting the inmate, but that he did

not know the origin of the foul odor, and that the waist chain could have caused the bag to rupture.

80.     Documents produced by the Cobb County Sheriff's Officer pursuant to an open record request do not contain the findings of the internal affairs investigation, though there is a notation that no CCDC officer was found to have violated department policy.

81.     Since there was no video and there were no other witnesses, the complaint was essentially the inmate's word against Defendant Reed's.

82.     Upon information and belief, therefore, no disciplinary action was taken against Defendant Reed in response to this incident.

83.     Regardless, the complaint put Command Staff Defendants on notice that Defendant Reed had a propensity toward losing his temper and using violence towards inmates.

### March 27, 2006 Excessive Force

84.     On March 27, 2006, Defendant Reed was booking an inmate at the sally port of the CCDC when the inmate angered Defendant Reed with a comment, "you'll come in my restaurant and get drunk all the time but next time you won't leave that way."

85.     The inmate was restrained in waist chain cuffs at the time.

86.     The inmate did not threaten Defendant Reed, use force, or take
any other action that would have justified a use of force by Defendant
Reed.

87.     In retaliation for the inmate's comment Defendant Reed slammed
the handcuffed inmate face-first  the floor..

88.     The inmate suffered a severely lacerated lip and was sent to the
hospital to receive stitches.

89.     Unlike the 2005 incident, the 2006 incident was captured on
video.

90.     In the ensuing internal affairs investigation, Defendant Reed was
found to have used excessive force in violation of the Cobb County
Sheriff's Office's policies.  Defendant was given only a written
reprimand and required to go to a "refresher" on defensive tactics
training; he was not suspended and he lost no pay.

**September 9, 2009 Excessive Force**

91.     On September 9, 2009, Defendant Reed was escorting a group of
inmates out of intake.  The group of inmates were all handcuffed to
each other in a "chain gang" configuration.

92.     Defendant Reed was walking beside one inmate who was
complaining about the size of his uniform.  The inmate ultimately

cursed at Defendant Reed during this interaction, though the inmate did not threaten Defendant Reed, use force against Defendant Reed, or take any other action that would have justified the use of force by Defendant Reed.

93.    After the inmate cursed at him, Defendant Reed grabbed the inmate's arm and grabbed the inmate in a headlock to take the inmate to the floor.

94.    Because the inmate was chained to a group of inmates, the entire group was pulled back and forth and another deputy had to run over to release the inmate from the chain.

95.    The incident was captured on surveillance video.

96.    In the ensuing internal affairs investigation, Defendant Reed was found to have used excessive force in violation of the Cobb County Sheriff's Office's use of force and force management policies.  Defendant was given a written reprimand and was to be given "counseling related to the proper response to verbal abuse from inmates" by Defendants Alder and Prince.

97.    The internal affairs hearing was conducted by Defendant Coker. Command staff present at the hearing were Defendants Beck, Bartlett, Alder, Prince, and Craig.  Defendant Warren was appraised of the

internal affairs investigation and its results, and he approved of the results.  Defendants Coker, Beck, Bartlett, Alder, Prince, Craig, and Warren are hereinafter "Command Staff Defendants."

98.     Again, after Defendant Reed used excessive force against a restrained inmate the only disciplinary action he received was a reprimand; he was not suspended and he lost no pay.  Defendant Reed was also to be given informal "counseling related to the proper response to verbal abuse from inmates" by Defendants Alder and Prince.

99.     On information and belief, this informal "counseling" contained no actual documentation, no written teaching materials, no lesson plan, and no testing at its conclusion; it was simply an informal conversation among Defendants Reed, Alder, and Prince.

## 2014 Conduct Unbecoming an Officer

100.     Defendant Reed was found to have violated Cobb County Sheriff's Office's policies by using unprofessional and profane language toward inmates in late 2013 and 2014.

101.     The internal affairs investigation was initiated because there were "excessive grievances" made against Defendant Reed between late 2013 and 2014.

102.     Late 2013 and 2014 grievances against Defendant Reed included

the following:

    a. A nurse at the jail complained that Defendant Reed sat at a desk

       with his legs open and asked the nurse to "look at this" in a

       sexual nature.  Defendant Reed confirmed this account to his

       superior.

    b. An inmate complained that Defendant Reed came into his cell,

       noticed a Qu'ran, and said, "get that shit outta here."

    c. An inmate stated that Defendant Reed "has talked about my

       girlfriend, my children, and my deceased father," and that

       Defendant Reed sent the inmate to a new Pod without socks or

       underwear, making the inmate leave behind his personal

       belongings and photographs "just to be nasty."

    d. An inmate reported that Defendant Reed "comes to work like he

       has a vengance [sic] … He demoralizes us speaks about our

       wives."

    e. An inmate stated that Defendant Reed "is harassing me all the

       time with ugly abusive language. He calls me nigger and bitch

       and makes comments about me that questions my sexual

orientation, queer, faggot, that kind of stuff.  He is cruel and won't leave me alone."

f.  An inmate stated that "Deputy Reed is verbally abusing me constantly, calling me 'nigger,' 'bitch,' 'pussy,' 'little girl,' and making references to my mother.  He does this loudly in front of other inmates and as a result, I get humiliated and teased."

g.  An inmate complained that when he tried to explain a discrepancy in a disciplinary report to Defendant Reed, Defendant Reed told the inmate to "get the fuck out of here."

h.  An inmate reported asking Defendant Reed for new clothing and a hygiene kit because the inmate had been wearing the same clothes for seven days, and that Defendant Reed responded, "get the fuck out of my face and sit the fuck down."

i.  A Muslim inmate complained that Defendant Reed told him that he could not have his Qu'ran on the table and "[his] religion is shit."

j.   An inmate reported the Defendant Reed "curse[d] me out badly" and told the inmate "he runs this motherfucker."

k.  An inmate filed a grievance stating that when he arrived in Defendant Reed's Pod, Defendant Reed "immediately started

threatening, antagonizing, basically singling me out and made a statement, 'I am DOC [Department of Corrections].'  I asked him if he meant that as a threat.  He responded, 'you'll see.'"

l. An inmate reported that Defendant Reed took the inmate's armband so that the inmate could not get his meals.

m. An inmate with a "two mat profile" (requires accommodation for medical issue) for a herniated disc filed a grievance because Defendant Reed "took the mat and call me a nigga he is very rude and disrespectful to inmates …"

n. An inmate reported that Defendant Reed came into his cell, accused the inmate of calling him a name, "then he call[ed] me a nigger."

o. An inmate complained, "[Defendant Reed has] been using his authority to make my time harder by talking about my mother and picking at me every time he comes in the dorm … [He] has no problem letting everyone know[] that he's going to pick on someone and belittle them in front of everyone!"

103.   While Defendant Reed denied almost all the specific allegations in the specific grievances, Defendant Reed did acknowledge using profanity around inmates and the internal affairs adjudication found

22

the complaint as "sustained."  The adjudication did not indicate exactly which of the 15+ grievances were deemed to be founded.

104.    Defendant Reed also admitted that he had been previously counseled for his language at the jail by his supervisors.

105.    As a result of the internal affairs investigation, Defendant was given only a verbal reprimand.

106.    The internal affairs investigation was conducted by Lieutenant Mehling and Investigator Carter, and ultimately reviewed and closed without hearing by Defendant Prince.

107.    Defendants Warren, Beck, Bartlett, and Craig were appraised of the investigation and its results, and approved of the results.

108.    Yet again, after Defendant Reed demonstrated an inability to control his temper with inmates, the only disciplinary action he received was a verbal reprimand; he was not suspended, he lost no pay, and he remained allowed to oversee inmates without direct supervision.

109.    Moreover, there was no counseling or training associated with the internal affairs finding.

## Other Internal Affairs Investigations

110.    Defendant Reed was given a one-day suspension when he failed to conduct a required headcount on April 17, 2000, then knowingly misrepresented that a headcount had been conducted.

111.    In August of 2005, Defendant Reed was given a verbal reprimand for approaching a Bartow County citizen who had pulled over to ask for directions, displaying a badge to the citizen, and ordering the citizen to move – all because the citizen was delaying Defendant Reed's commute. The citizen reported that Defendant Reed was acting "irate" and that he had the demeanor of a person who was exhibiting symptoms of steroid abuse.

112.    In September of 2005, Defendant Reed improperly had a Cobb County Police Department officer run a tag for him to determine the owner of an abandoned vehicle on his property.  Defendant Reed's supervisor, Major Hunton, told Defendant Reed that running a GCIC search for personal reasons was improper, but no disciplinary action was taken.

113.    In fact, pursuant to O.C.G.A. § 35-3-38(a), misuse of GCIC is a felony punishable by up to two years in prison.  In failing to take action beyond telling Defendant Reed that misuse of GCIC is improper,

24

Command Staff Defendants thus turned a blind eye to Defendant Reed's criminal conduct.

114.    Moreover, the GCIC Rules, enacted pursuant to Georgia law and articulated by Department of Human Services Office of Inspector General, mandate that all local agencies are *required* to have disciplinary procedures for the violations of GCIC rules, to take disciplinary action against an employee who violates the GCIC rules, and to report any such violations to the GCIC in writing.[2]  By closing his eyes to Defendant Reed's clear violation of GCIC rules, Major Hunton ignored a criminal offense and violated GCIC rules in doing so.

**115.**    In June of 2008, Defendant Reed was arrested on a Bartow County Probate Court bench warrant for failure to appear.  Defendant Reed had been named guardian of a financial settlement awarded to his daughter after an accident, and he had forfeited the entire settlement by using it as collateral on a personal loan on which he defaulted. The court appearance Defendant Reed missed was associated with Defendant Reed's failure to file an annual return with

---

[2] *See Disciplinary Measures for Misuse of GCIC/NCIC Criminal Justice Information*, available at http://odis.dhs.ga.gov/ChooseCategory.aspx?cid=1396 (last visited 5/18/17); GCIC Rule 140-2-.09, available at https://gbi.georgia.gov/sites/gbi.georgia.gov/files/imported/vgn/images/portal/cit_1210/38/8/88224162GCIC%20Rules%202007%20Final.pdf (last visited 5/18/17).

the court, which would have revealed the forfeiting of the account.  The internal affairs investigation into this matter was closed as "documentation only" and Defendant Reed was not disciplined.

116.    On May 18, 2015, only ten days before the incident with Plaintiff here, Defendant Reed was suspended for 16 hours after he violated the rules concerning the supervision of inmates in segregation housing.

117.    Specifically, Defendant Reed allowed segregation inmates to remain outside of segregation for longer than CCDC policy allowed and allowed a favored inmate out of his cell in violation of CCDC policy.

118.    Defendant Reed's violations of policy resulted in a fight between segregation inmates and involving a Special Management Level 1 inmate (the highest and most dangerous level of inmate classification).

119.    Defendants Beck, Craig, and Prince were present and participated in the internal affairs hearing, and Defendant Warren conducted the hearing and ultimately sent Defendant Reed the notice of his suspension.

120.    Defendant Reed's suspension was scheduled for June 1 and 2, 2015, but Defendant Reed was never reached that point because the incident with Plaintiff and his termination occurred first.

## COUNT I

### Section 1983 – Excessive Force (Defendant Reed)

121.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

122.    Defendant Reed used excessive force against Plaintiff in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution when he violently shoved Plaintiff to the ground, breaking Plaintiff's hip, while Plaintiff was not resisting any jailer, was not causing a disturbance, and did not pose a threat to any person.

123.    Because the booking process was not complete and Plaintiff was still in a holding cell when the incident occurred, the Fourth Amendment governs the analysis and Defendant Reed's use of force was excessive and unreasonable under the Fourth Amendment.

124.    In the alternative, if the use of force is examined under the Fourteenth Amendment, Defendant Reed's use of force was excessive and unreasonable under the Fourteenth Amendment.

125.    Plaintiff claims damages for the injuries set forth above under 42 U.S.C. § 1983 against Defendant Reed for violations of Plaintiff's constitutional rights under color of law.

## COUNT II
### State Law – Assault and Battery (Defendant Reed)

126.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

127.    Defendant Reed committed assault and battery against Plaintiff in violation of O.C.G.A. §§ 51-1-13 and 51-1-14 when he violently shoved Plaintiff to the ground, shattering Plaintiff's hip, while Plaintiff was not resisting any jailer and did not pose a threat to any person.

128.    Plaintiff claims damages for the injuries set forth above under O.C.G.A. §§ 51-1-13 and 51-1-14 against Defendant Reed for violations of Plaintiff's rights under Georgia law.

## COUNT III
### Section 1983 – Supervisory Liability
### (Command Staff Defendants, Individual Capacity)

129.    The preceding paragraphs are incorporated herein by reference as though fully set forth.

130.    Command Staff Defendants, at all times material hereto, were members of the command staff at the CCDC.

131.    As members of the command staff, at all times material hereto, Command Staff Defendants had supervisory roles at the CCDC.

## 2009 Internal Affairs Investigation and Hearing
### (Excessive Force)

132.    Command Staff Defendants played active roles in the internal affairs hearing and results regarding Defendant Reed's 2009 use of excessive force.

133.    Within the 2009 internal affairs investigation and hearing, Command Staff Defendants reviewed Defendant Reed's entire personnel file.

134.    Within the 2009 internal affairs investigation and hearing, Command Staff Defendants specifically reviewed Defendant Reed's previous internal affairs investigations.

135.    When evaluating the 2009 internal affairs investigation for excessive force, Command Staff Defendants were therefore aware of Defendant Reed's history of losing his temper, his history of violence towards inmates, and his history of disregarding department policy and violating the law.

   a. Command Staff Defendants were aware of the 2005 report of excessive force against Defendant Reed, as is set out above.

   b. Command Staff Defendants were also aware of Defendant Reed's 2006 use of excessive force, verified by video, wherein Defendant

Reed slammed a restrained inmate's face to the floor sending the inmate to the hospital for stitches, as is set out above.

c.   In fact, Defendant Alder was involved in and personally requested the 2006 internal affairs investigation, and Defendants Coker, Beck, and Bartlett were notified of the investigation at its outset.

136.   When evaluating the 2009 internal affairs investigation for excessive force, Command Staff Defendants were also aware of Defendant Reed's history of disciplinary trouble as is summarized above in the section titled, "Other Internal Affairs Investigations," and which includes several other instances in which Defendant Reed violated department policy and committed criminal acts.

137.   When evaluating the 2009 internal affairs investigation for excessive force, despite Command Staff Defendants' personal knowledge of these incidents, Command Staff Defendants did not terminate Defendant Reed's employment or assign Defendant Reed to different duties.  Command Staff Defendants allowed Defendant Reed to keep working as a jailer.

138.   When evaluating the 2009 internal affairs investigation for excessive force, despite Command Staff Defendants' personal

knowledge of these incidents, Command Staff Defendants allowed Defendant Reed to keep working as a jailer and specifically allowed Defendant Reed to oversee and control inmates without direct supervision.

139.    Command Staff Defendants turned a blind eye to Defendant Reed's substantial history of violent acts against inmates, violations of department policy, criminal behavior, and a categorical inability to control his temper around inmates when Command Staff Defendants merely issued a reprimand and informal "counseling" for Defendant Reed's second verified violent attack on an inmate (his third overall).

140.    By merely issuing a reprimand and informal "counseling" after a substantial history of violent acts against inmates, violations of department policy, criminal behavior, and a categorical inability to control his temper around inmates, Command Staff Defendants gave Defendant Reed reason to believe such conduct was tolerated or encouraged at the CCDC.

141.    By merely issuing a reprimand and informal "counseling" after a substantial history of violent acts against inmates, violations of department policy, criminal behavior, and a categorical inability to control his temper around inmates, Command Staff Defendants failed

to adequately train, supervise, or discipline Defendant Reed with

regard to the proper way to handle disagreements with inmates, how to

manage his temper around inmates, or the improper use of force

against inmates, virtually ensuring that Defendant Reed would again

lose his temper around an inmate and cause a serious injury.

### 2014 Internal Affairs Investigation and Hearing
### (Conduct Unbecoming an Officer)

142.    Defendant Prince was the ultimate arbiter of the 2014 internal

affairs matter regarding Defendant Reed's 2014 grievances by inmates.

The internal affairs matter was closed without formal hearing by

Defendant Prince.

143.    Within the 2014 internal affairs matter, Defendants Prince,

Warren, Beck, Bartlett, and Craig were aware of Defendant Reed's

entire personnel file.

144.    Within the 2014 internal affairs matter, Defendants Prince,

Warren, Beck, Bartlett, and Craig were specifically aware of Defendant

Reed's previous internal affairs investigations.

145.    When evaluating the 2014 internal affairs investigation,

Defendants Prince, Warren, Beck, Bartlett, and Craig were therefore

aware of Defendant Reed's history of losing his temper, his history of

violence towards inmates, and his history of disregarding department policy and violating the law.

a.  When evaluating the 2014 internal affairs investigation, Defendants Prince, Warren, Beck, Bartlett, and Craig were aware of the 2005 allegation of excessive force against Defendant Reed, as is set out above.

b.  When evaluating the 2014 internal affairs investigation, Defendants Prince, Warren, Beck, Bartlett, and Craig were also aware of the 2006 allegation of excessive force against Defendant Reed which was deemed to be "founded," wherein Defendant Reed slammed a restrained inmate's face to the floor sending the inmate to the hospital for stitches, as is set out above.

c.  When evaluating the 2014 internal affairs investigation, Defendants Prince, Warren, Beck, Bartlett, and Craig were also aware of the 2009 allegation of excessive force against Defendant Reed which was deemed to be "founded," wherein Defendant Reed tried to slam a restrained inmate to the ground with a headlock while the inmate was chained to another group of inmates, simply because the inmate said something that angered Defendant Reed, as is set out above.

146.   When evaluating the 2014 internal affairs investigation, Defendants Prince, Warren, Beck, Bartlett, and Craig were also aware of Defendant Reed's history of disciplinary trouble and criminal activity as is summarized above in the section titled, "Other Internal Affairs Investigations," and which includes other instances in which Defendant Reed violated department policy and committed criminal acts.

147.   When evaluating the 2014 internal affairs investigation, despite their personal knowledge of these incidents, Defendants Prince, Warren, Beck, Bartlett, and Craig did not terminate Defendant Reed's employment or assign Defendant Reed to different duties.  Defendants Prince, Warren, Beck, Bartlett, and Craig allowed Defendant Reed to keep working as a jailer.

148.   When evaluating the 2014 internal affairs investigation, despite their personal knowledge of these incidents, Defendants Prince, Warren, Beck, Bartlett, and Craig allowed Defendant Reed to keep working as a jailer and specifically allowed Defendant Reed to handle and control restrained inmates without direct supervision.

149.   Defendants Prince, Warren, Beck, Bartlett, and Craig turned a blind eye to Defendant Reed's substantial history of violent acts against inmates, violations of department policy, criminal behavior, and a

categorical inability to control his temper around inmates when he merely issued a verbal reprimand for Defendant Reed's year-long campaign of verbal abuse against numerous inmates.

150.    By merely issuing a verbal reprimand after a substantial history of violent acts against inmates, violations of department policy, criminal behavior, and a categorical inability to control his temper around inmates, Defendants Prince, Warren, Beck, Bartlett, and Craig gave Defendant Reed reason to believe such conduct was tolerated or encouraged at the CCDC.

151.    By merely issuing a verbal reprimand after a substantial history of violent acts against inmates, violations of department policy, criminal behavior, and a categorical inability to control his temper around inmates, Defendants Prince, Warren, Beck, Bartlett, and Craig failed to adequately train, supervise, or discipline Defendant Reed with regard to the proper way to handle disagreements with inmates, how to manage his temper around inmates, or the improper use of force against inmates, virtually ensuring that Defendant Reed would again lose his temper around an inmate and cause a serious injury.

**May 2015 Internal Affairs Investigation and Hearing
(Favoritism to Inmates and Violation of Policy)**

152.     Defendants Craig, Prince, Beck, and Warren were present and active participants in the 2015 internal affairs matter regarding Defendant Reed's favoritism to inmates and violations of policy.  The hearing was conducted by Defendant Warren.

153.     Within the 2015 internal affairs matter, Defendants Warren, Craig, Prince, and Beck were aware of Defendant Reed's entire personnel file.

154.     Within the 2015 internal affairs matter, Defendants Warren, Craig, Prince, and Beck were specifically aware of Defendant Reed's previous internal affairs investigations.

155.     When evaluating the 2015 internal affairs investigation, Defendants Warren, Craig, Prince, and Beck were therefore aware of Defendant Reed's history of losing his temper, his history of violence towards inmates, and his history of disregarding department policy and violating the law.

    a.  When evaluating the 2015 internal affairs investigation, Defendants Warren, Craig, Prince, and Beck were aware of the

2005 allegation of excessive force against Defendant Reed, as is set out above.

b. When evaluating the 2015 internal affairs investigation, Defendants Warren, Craig, Prince, and Beck were also aware of the 2006 allegation of excessive force against Defendant Reed which was deemed to be "founded," wherein Defendant Reed slammed a restrained inmate's face to the floor sending the inmate to the hospital for stitches, as is set out above.

c. When evaluating the 2015 internal affairs investigation, Defendants Warren, Craig, Prince, and Beck were also aware of the 2009 allegation of excessive force against Defendant Reed which was deemed to be "founded," wherein Defendant Reed tried to slam a restrained inmate to the ground with a headlock while the inmate was chained to another group of inmates, simply because the inmate said something that angered Defendant Reed, as is set out above.

d. When evaluating the 2015 internal affairs investigation, Defendants Warren, Craig, Prince, and Beck were also aware of Defendant Reed's 2014 pattern of racial epithets, profanity, and

threats toward inmates, and Defendant Reed's continued

propensity to lost his temper with inmates.

156.    When evaluating the 2015 internal affairs investigation for

excessive force, Defendants Warren, Craig, Prince, and Beck were also

aware of Defendant Reed's history of disciplinary trouble and criminal

activity as is summarized above in the section titled, "Other Internal

Affairs Investigations," and which includes other instances in which

Defendant Reed violated department policy and committed criminal

acts.

157.    When evaluating the 2015 internal affairs investigation, despite

their personal knowledge of these incidents, Defendants Warren, Craig,

Prince, and Beck did not terminate Defendant Reed's employment or

assign Defendant Reed to different duties.  Defendants Warren, Craig,

Prince, and Beck allowed Defendant Reed to keep working as a jailer.

158.    When evaluating the 2015 internal affairs investigation, despite

their personal knowledge of these incidents, Defendants Warren, Craig,

Prince, and Beck allowed Defendant Reed to keep working as a jailer

and specifically allowed Defendant Reed to handle and control

restrained inmates without direct supervision.

159.   Defendants Warren, Craig, Prince, and Beck turned a blind eye to Defendant Reed's substantial history of violent acts against inmates, violations of department policy, criminal behavior, and a categorical inability to control his temper around inmates when he merely issued a verbal reprimand for Defendant Reed's year-long campaign of verbal abuse against numerous inmates.

160.   By merely issuing 16-hour suspension after a substantial history of violent acts against inmates, violations of department policy, criminal behavior, and a categorical inability to control his temper around inmates, Defendants Warren, Craig, Prince, and Beck gave Defendant Reed reason to believe such conduct was tolerated or encouraged at the CCDC.

161.   By merely issuing a 16-hour suspension after a substantial history of violent acts against inmates, violations of department policy, criminal behavior, and a categorical inability to control his temper around inmates, Defendants Warren, Craig, Prince, and Beck failed to adequately train, supervise, or discipline Defendant Reed with regard to the proper way to handle disagreements with inmates, how to manage his temper around inmates, or the improper use of force

against inmates, virtually ensuring that Defendant Reed would again

lose his temper around an inmate and cause a serious injury.

### 2009, 2014, and 2015 Internal Affairs Investigations

162.    During the 2009, 2014, and 2015 internal affairs investigations,

adequate scrutiny of Defendant Reed's disciplinary history would have

lead a reasonable supervisor to conclude that the plainly obvious

consequence of the decision to allow Defendant Reed to keep working as

a jailer and to handle and control restrained inmates without direct

supervision would be the deprivation of an inmate's right to be free

from the use of excessive force.

163.    During the 2009, 2014, and 2015 internal affairs matters,

Command Staff Defendants disregarded a known and obvious

consequence of allowing Defendant Reed to keep working as a jailer

and to handle and control restrained inmates without direct

supervision – that Defendant Reed would again lose his temper and

retaliate against inmates with excessive force.

164.    As is outlined above, Command Staff Defendants failed to

adequately discipline, supervise, and train Defendant Reed.

165.    Command Staff Defendants failed to adequately discipline,

supervise, and train Defendant Reed in the proper use of force with

inmates, in controlling his temper around inmates, and in following the policies of CCDC and the Cobb County Sheriff's Office as well as Georgia law.

166.    A reasonable person in the position of Command Staff Defendants would understand that the failure to adequately discipline, supervise, and train Defendant Reed in in the proper use of force with inmates, in controlling his temper around inmates, and in following the policies of CCDC and the Cobb County Sheriff's Office as well as Georgia law would constitute deliberate indifference.

167.    Command Staff Defendants deliberately turned a blind eye to Defendant Reed's repeated transgressions, creating a custom, pattern, and practice that allows officers to ignore written policies and receive no retribution or punishment for violating those policies, and that specifically allows officers to use excessive force against inmates without fear of retribution or punishment.

168.    In their supervisory capacities, therefore, the actions of Command Staff Defendants were casually connected to Defendant Reed's use of excessive force against Plaintiff.

## Prayer For Relief

WHEREFORE, Plaintiff prays that this Court issue the following relief:

1) That process issue in accordance with the law;

2) That the Court award Plaintiff compensatory and general damages in an amount to be determined by the jury against the Defendants, jointly and severally;

3) That the Court award Plaintiff punitive damages in an amount to be determined by the enlightened conscience of the jury against the Defendants;

4) That the Court award costs of this action, including attorneys' fees, to Plaintiff, pursuant to U.S.C. § 1988 and other applicable laws regarding such awards;

5) That the Court award Plaintiff such other and further relief as it deems just and necessary; and

6) That Plaintiff be granted a trial by jury.

This 19th Day of October, 2017

**HORSLEY BEGNAUD, LLC**

/s/ Mark Begnaud
Mark Begnaud
Georgia Bar No. 217641
mbegnaud@gacivilrights.com

42

Nathanael A. Horsley
Georgia Bar No. 367832
nhorsley@gacivilrights.com

750 Hammond Drive,
Building 12, Suite 300
Atlanta, Ga 30328
770-765-5559

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **First Amended Complaint** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants:

H. William Rowling, Jr.
Assistant County Attorney
H.William.Rowling@cobbcounty.org
Lauren S. Bruce
Senior Associate County Attorney
Lauren.Bruce@cobbcounty.org
COBB COUNTY ATTORNEY'S OFFICE
100 Cherokee Street
Suite 350
Marietta, Ga 30090
770-528-4000

This 19th day of October, 2017.

/s/ Mark Begnaud
Mark Begnaud
Georgia Bar No. 217641
mbegnaud@gacivilrights.com

**HORLSEY BEGNAUD LLC**
750 Hammond Drive,
Building 12, Suite 300
Atlanta, Ga 30328
770-765-5559 (phone)
404-602-0018 (fax)